UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JONATHAN C. RICHARDSON, a/k/a
AUTUMN E. CORDELLIONE,

    Plaintiff,

    v.

MR. THOMPSON, MS. GOSE, and JANE
DOE,

    Defendants.

CAUSE NO. 3:25-CV-863-JTM-AZ

OPINION AND ORDER

Jonathan C. Richardson, a/k/a Autumn E. Cordellione,[1] a prisoner without a lawyer, filed a complaint in the Southern District of Indiana on April 1, 2025 (DE # 1), that was transferred to this court on October 15, 2025. (DE # 15.) "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

---

[1] Jonathan C. Richardson identifies as transgender and goes by the name Autumn E. Cordellione, so the court will refer to the plaintiff as Cordellione throughout this order.

Cordellione is currently incarcerated at the New Castle Correctional Facility (NCCF). Although Cordellione had previously been housed in protective custody at NCCF, on January 28, 2025, Cordellione was transferred to the Westville Correctional Facility (WCF) and remained there for about a week.[2] The complaint describes WCF as a "Level 1-R facility (WCA)" having "no security cameras, with no doors on the cells, understaffed, and populated with mostly gang affiliated prisoners who traffic with correctional staff in the form of drugs, sex, and money." (DE # 1 at 2.) Cordellione claims WCF is "known for its high level of offender on offender assaults and is rife with drugs." *Id*. The complaint alleges the Indiana Department of Correction (IDOC) Director of Classification sent Cordellione to WCF with knowledge that:

> [P]laintiff who is transgender has been assaulted for being transgender, has been assaulted (stabbed) for refusing sex with another offender, has a high profile criminal and civil case that have recently been broadcast across multiple national and local news media outlets in which they reported on her criminal history and transgender status, name, as well as her civil cases' preliminary injunction for gender affirming surgery.

*Id*. at 2–3. Immediately upon arrival at WCF, Cordellione was allegedly "assaulted and raped multiple times over a four day period by 12 gang affiliated offenders; from January 28th, 29th, 30th, and 31st, 2025." *Id*. at 3. The rapists told Cordellione they were doing it because they saw the story on FOX News and stated, "Trump's president now

---

[2] A certified trust fund account statement attached to the complaint indicates Cordellione returned to NCCF on February 4, 2025, within days of the transfer. (DE # 1 at 13.) This is consistent with the trust fund ledgers attached to the motion to proceed in forma pauperis, which show the bulk of Cordellione's financial transactions occurred at NCCF except for two in late January of 2025 that occurred at WCF. (*See* DE #2 at 4–8.)

2

and we won't ever get in trouble for fucking you trannies up; we're patriots and even if you tell on us, [T]rump will pardon us and probably give us a medal." *Id*.

On January 29, 2025, Cordellione reported the assaults to Unit Team Manager (UTM) Thompson who allegedly responded that he had seen the story on the news, did not think taxpayers should have to fund gender reassignment surgery, and essentially blamed the assaults on Cordellione for "dress[ing] like a woman and hav[ing] tits in a male facility." *Id*. at 4. That same day, Cordellione reported the incidents to Officer Jane Doe who claimed she could not help and would tell the assailants Cordellione was a "snitch" if the issue were pursued. *Id*. On January 30th or 31st, Cordellione reported the assaults to Case Manager Gose, who also refused to help and allegedly responded, "Your [sic] that trans that won a lawsuit, and now us hard working taxpayers have to foot the bill, well there are only two sexes, male and female, and God made you a man. Trump's putting a stop to all that fag shit." *Id*.

Cordellione has sued President Donald J. Trump, the IDOC Director of Classification, UTM Thompson, Case Manager Gose, and Officer Jane Doe in their individual capacities for allegedly violating the Constitution and committing the state law tort of gross negligence. Cordellione seeks compensatory and punitive damages as well as injunctive relief.

*Eighth Amendment Failure to Protect*

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832

(1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id*. at 833. That said, not every such violent altercation violates the Constitution. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). "Rather, only deliberate indifference to an inmate's wellbeing is actionable: a prison official is liable for failing to protect an inmate from another prisoner only if the official knows of and disregards an excessive risk to inmate health or safety." *Id*. (internal quotation marks, brackets, and citations omitted). Accordingly, when an inmate is attacked by another inmate, the Eighth Amendment is violated only if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen." *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir. 1996). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[A] complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015). General requests for help, expressions of fear, and even prior attacks are insufficient to alert guards to the need for action. *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008). "[P]risons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008).

In the context of failure to protect cases, the Seventh Circuit has equated "substantial risk" to risks so great that they are almost certain to materialize if nothing

is done. *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005); *see also Thomas v. Dart*, 39 F.4th 835, 843 (7th Cir. 2022) (quoting *Brown* and noting that a "bare 'increased risk' does not necessarily correlate to a 'substantial risk'"). "[A] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). "Exercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety." *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997).

Cordellione alleges the rapes and assaults—which occurred over the course of four days and were committed by the same group of twelve gang-affiliated inmates—were contemporaneously reported to UTM Thompson, Officer Jane Doe, and Case Manager Gose. Cordellione alleges that they refused to assist in preventing the ongoing attacks; instead, they allegedly referenced the news stories regarding Cordellione's previous lawsuits and expressed their own personal and/or religious beliefs about transgenderism as reasons for ignoring the requests for help. While further factual development may show the defendants acted reasonably once they were aware of Cordellione's safety concerns, the court must give Cordellione the benefit of the inferences allowed at this stage. Accordingly, the failure to protect claims against UTM Thompson, Officer Jane Doe,[3] and Case Manager Gose will be allowed to proceed. *See, e.g., Balsewicz v. Pawlyk*, 963 F.3d 650, 656 (7th Cir. 2020), *as amended* (July 2, 2020)

---

[3] Cordellione describes Officer Jane Doe as "an officer working on her dorm" on January 29, 2025. The Warden of WCF will be added as a defendant for the sole purpose of identifying this unknown defendant.

5

(allegations that guard took no action after learning of an ongoing threat to plaintiff prior to him being punched in the head by another inmate "would allow a reasonable juror to infer, from circumstantial evidence, both that [guard] was 'aware of facts' indicating the danger of serious harm to [plaintiff] was not yet over and that [guard] drew such an inference").

The same cannot be said of the IDOC Director of Classification. Cordellione alleges the Director "knowingly sent plaintiff who is transgender" to WCF despite being aware of the nationwide news stories detailing Cordellione's criminal and litigation history and prior assaults. (DE # 1 at 2.) Cordellione does not say where, by whom, or when those assaults occurred, so the allegations of prior assaults do not allow a reasonable inference of an individualized risk at WCF. And, although Cordellione seems to suggest WCF itself is inherently risky,[4] that isn't sufficient to subject the Director to individual liability. The assertions that WCF is known for a "high level" of assaults and is "rife with drugs" (DE # 1 at 2) are unsupported by factual details and, more importantly, do not imply Cordellione was at particular risk. *See Thomas*, 39 F.4th at 842 ("[S]imply being housed in the Jail's general population, even while suffering from [a "mental condition" that made the inmate "vulnerable"], is not a particular enough risk in the failure-to-protect context. The unfortunate reality is that jails and

---

[4] WCF is considered a mixed "Minimum and Medium Security" facility. *See* https://www.in.gov/idoc/facilities/adult (last visited Dec. 2, 2025). Based on the description in the complaint (*e.g.*, "no doors on the cells" and the label of "Level 1-R facility (WCA)" (DE # 1 at 2), it may be inferred that Cordellione was placed in a minimum-security unit along with other similarly classified minimum-security level offenders. *See* https://www.in.gov/idoc/files/WCC-Facts-and-Figures-Brochure.pdf (last visited Dec. 2, 2025) ("R dorm (WCA) holds 381 minimum security inmates.").

6

prisons are dangerous places inhabited by violent people.") (citing *Grieveson*, 538 F.3d at 777)). Nothing in the complaint plausibly suggests the Director was aware of any threats to transgender inmates in general at WCF or a specific risk of substantial harm to Cordellione based on the media coverage. Thus, the claim against the Director will be dismissed. *See id*. at 843 ("[A] valid failure-to-protect claim was not alleged when a mentally ill detainee was assaulted by another inmate over the detainee's hygiene problem because jail personnel—though aware of the hygiene problem—'had no notice that he was at risk of assault because of that problem.'") (quoting *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 668 (7th Cir. 2012), abrogated on other grounds by *Kingsley v. Hendrickson*, 576 U.S. 389, (2015)).

Cordellione also blames President Trump for the assaults and rapes because President Trump has "spoken about his extremist rhetoric and transphobic hate speech." (DE # 1 at 4.) The complaint claims the speech "emboldened the Defendants, and the assailants that brutally assaulted and raped plaintiff, not once, but multiple times to act on their hate and prejudices, constituting the cause in action and his liability in this case." *Id*. Cordellione believes the words were a "motivating factor" and that President Trump knows "others may act on his words and the plaintiff suffered violence because of this." *Id*.

Even if Cordellione could surpass the limitations set out by *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971), First Amendment speech protections, and presidential immunity issues, a fundamental problem still exists with regard to this claim—individual liability requires personal involvement. "A defendant

7

cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation." *Moderson v. City of Neenah*, 137 F.4th 611, 617 (7th Cir. 2025) (citation omitted). President Trump is not personally responsible for the operations of IDOC or the safety of the inmates within its facilities. Speaking generally about transgenderism on the national stage is not enough to subject President Trump to individual liability in this situation. These allegations fail to state a claim, so they will be dismissed.

Finally, Cordellione asserts, without elaboration, that "[a]ll Defendants violated the plaintiff's 14th Amendment [rights], discriminating against the plaintiff due to her transgender status." (DE # 1 at 4.) This conclusory statement is insufficient to state a claim. Moreover, the essence of the complaint is that the defendants failed to protect Cordellione from harm. Why they did so may be relevant later in the litigation, but it would be redundant as a separate constitutional claim. *See, e.g., Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) ("[Plaintiff] says that the complaint includes other 'Equal Protection and Eighth Amendment claims' related to his Fast of Ramadan claim, but the free-exercise claim arises under the First Amendment and gains nothing by attracting additional constitutional labels.") (citing *Graham v. Connor*, 490 U.S. 386, 395, (1989) (constitutional claims must be addressed under the most applicable provision)).

*State Law Negligence*

Cordellione claims the defendants "violated Indiana Tort Law, with their gross negligence and wanton disregard of the plaintiff's safety." (DE # 1 at 4.) "A plaintiff

seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Wheeler v. State*, 180 N.E.3d 305, 309 (Ind. Ct. App. 2021) (citing *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011)). "Negligence and gross negligence possess the same elements (duty, breach, and injury), but the two torts have different definitions of what constitutes a 'breach.'" *Sims v. Humane Soc. of St. Joseph Cnty. Indiana Inc.*, 758 F. Supp. 2d 737, 751 (N.D. Ind. 2010) (citing *N. Ind. Public Serv. Co. v. Sharp*, 790 N.E.2d 462, 465–66 (Ind. 2003)).

> In the case of ordinary negligence, a plaintiff must demonstrate that a defendant 'merely *failed to exercise* its duty of care,' while in the case of gross negligence, a plaintiff must demonstrate that a defendant breached its duty of care by 'engag[ing] in a *conscious, voluntary* act or omission in reckless disregard of the consequences' to the plaintiff.

*Id.* (quoting *Sharp*, 790 N.E.2d at 465).

Cordellione's claims of gross negligence against the state defendants trigger the application of the Indiana Tort Claims Act (ITCA). IND. CODE § 34-13-3 *et seq*. The ITCA shields government employees from liability for conduct within the scope of their employment. *See* IND. CODE § 34-13-3-5(b); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment."). In order to bring a state law tort claim against a governmental employee personally, a plaintiff "must allege that an act or omission of the employee that causes a loss is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the

9

employee personally." IND. CODE § 34-13-3-5(c). There must be a "reasonable factual basis supporting the allegations." *Id.*; *see also Ball*, 760 F.3d at 644–45 (noting that federal pleading standards apply). "The purpose of the ITCA is to 'ensure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment.'" *Smith v. Ind. Dep't of Corr.*, 871 N.E.2d 975, 986 (Ind. Ct. App. 2007) (quoting *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 452 (Ind. 2000)). Accordingly, although the act or omission may be alleged to fall under one of the categories delineated in IND. CODE § 34-13-3-5(c), that fact "standing alone is not dispositive of whether the employee was acting outside the scope of employment." *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003).

"When the employee's conduct is 'of the same general nature as that authorized, or incidental to the conduct authorized,' it is deemed 'within the scope of employment.'" *Smith*, 871 N.E.2d at 986 (quoting *Celebration Fireworks,* 727 N.E.2d at 453). This may include "acts that the employer expressly forbids; that violate the employer's rules, orders, or instructions; that the employee commits for self-gratification or self-benefit; that breach a sacred professional duty; or that are egregious, malicious, or criminal." *Cox v. Evansville Police Dept.*, 107 N.E.3d 453, 461 (Ind. 2018). "Even criminal acts may be considered as being within the scope of employment if the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Bushong*, 790 N.E.2d at 473 (quotation marks omitted); *see also Higgason v. State*, 789 N.E.2d 22, 30 (Ind. Ct. App. 2003) ("[W]illful or

10

wanton behavior does not necessarily remove one from the scope of his employment.") (quoting *Kemezy v. Peters*, 622 N.E.2d 1296, 1298 (Ind. 1993)). Rather, "[t]he critical inquiry is whether the tortious act arose naturally or predictably from the employment context." *Cox*, 107 N.E.3d at 464.

Whether an act or omission is within the scope of employment for purposes of ITCA immunity is an affirmative defense. *See Bushong*, 790 N.E.2d at 472 (when no "scope of employment" allegation is made in the complaint, "a government employee defendant has a complete defense: the action occurred within the scope of employment"). Typically, complaints need not anticipate and attempt to plead around defenses. *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004). However, the court can dismiss a claim if the defense is apparent on the face of the complaint. *See, e.g., Holmes v. Marion Cnty. Sheriff's Office*, 141 F.4th 818, 822 (7th Cir. 2025); *U.S. v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005) (when "complaint itself set[s] forth everything necessary to satisfy the affirmative defense" it may be dismissed).

Here, it is apparent the correctional officers' alleged disregard of Cordellione's safety concerns fell within the scope of their employment. As noted above, duty is an element of all negligence claims, and, in this case, that duty to protect Cordellione existed solely because of their employment. "As a general rule, an individual does not have a duty to aid or protect another person, even if he knows that person needs assistance." *Baker v. Fenneman & Brown Props., LLC*, 793 N.E.2d 1203, 1206 (Ind. Ct. App. 2003). However, incarcerated individuals are owed a unique duty of care by the IDOC and its employees:

11

> [P]ublic policy considerations require that the DOC not be made an absolute insurer of prisoners' safety. Although the DOC is not a guarantor, neither has it been relieved of all responsibility for safekeeping its charges. Rather, the DOC's responsibility takes the middle ground: it has the duty to take reasonable precautions to preserve the life, health, and safety of prisoners. Because of the DOC's unusual ability to control all aspects of its prisoners' lives, the DOC's duty to take reasonable precautions may include an obligation to control the conduct of third persons.

*Williams v. Ind. Dep't of Corr.*, 142 N.E.3d 986, 1008 (Ind. Ct. App. 2020), on reh'g (Apr. 8, 2020) (internal quotation marks and citations omitted). Correctional officers are tasked with determining what actions to take—or whether to act at all—in response to an inmate's allegations of attacks and/or threats by other inmates. Here, any liability is based on a failure to act—a duty they hold solely due to their employment. Because the correctional officers' alleged failure to act regarding Cordellione's safety concerns was within the scope of their employment, they are shielded from personal liability. *See, e.g.*, *Ball*, 760 F.3d at 645 (even assuming, *arguendo*, that plaintiff's allegations of willful, wanton, and/or malicious behavior under IND. CODE § 34-13-3-5(c) were sufficiently pled, the claims were properly dismissed because the officer was not "amenable to suit at all" as he was acting within the scope of his employment); *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204 (Ind. Ct. App. 2011) (complaint for negligence against fire chief alleged he "exhibited conduct that may be deemed willful and wanton and with reckless disregard," but because those facts showed his conduct "was at least incidental to conduct authorized" in the scope of his employment, the ITCA barred the action against him as an individual); *Smith v. Ind. Dep't of Corr.*, 871 N.E.2d 975, 986 (Ind. Ct. App. 2007) (affirming judgment on the pleadings dismissing prisoner's negligence

claims against prison officers for injuries incurred during a cell extraction because "[e]nforcing discipline and maintaining prison security is clearly within the prison officers' scope of employment"). Accordingly, the state law tort claims against the officers will be dismissed.[5]

Regarding the Director of Classification, the Director is tasked with overseeing the classification system and coordinating classification services which include the placement, security level, and facility assignments of inmates within the IDOC. *See, e.g.*, IND. CODE § 11-10-1-1; *see also* IDOC Policy and Administrative Procedure 01-04-101, titled "Adult Offender Classification." As an IDOC employee, the Director has a duty to take reasonable precautions as to the safety of inmates when authorizing or coordinating transfers. *See Williams*, 142 N.E.3d at 1008. Here, the Director is alleged to have authorized the transfer to WCF with knowledge of Cordellione's history and the fact that WCF is generally known for offender violence and drugs. Cordellione claims this transfer was done with gross negligence in wanton disregard of the consequences, which resulted in the later attacks.

Even assuming the action could somehow fall outside the Director's scope of employment, Cordellione still has not stated a plausible claim. To bring a state law tort

---

[5] Cordellione has sued the state defendants in their individual capacities only. (*See* DE # 1 at 1.) The ITCA permits a litigant to sue an individual's employer in state court. IND. CODE § 34-13-3-5(b). In this case, the employer is the IDOC, which is an agency of the state. *See Fritz v. Evers*, 907 F.3d 531, 533 (7th Cir. 2018) ("[A] state official (in his official capacity) is the state."). However, in federal court, states and their agencies enjoy Eleventh Amendment immunity. *See Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) ("The Eleventh Amendment prevents us from adjudicating the state-law claims against the state officials in their official capacity."); *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. 2008) ("[S]tate agencies, as arms of the state, are immune from suit under the Eleventh Amendment."). Thus, even if any of the state defendants had been named in their official capacities, Cordellione would not be able to proceed against them here.

claim against the Director personally, there must be a reasonable factual basis supporting the allegation of willful and wantonness. IND. CODE § 34-13-3-5(c). In Indiana, "[t]he elements of willful or wanton misconduct are: (1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and (2) the actor's conduct must have exhibited an indifference to the consequences of his conduct." *Ellis*, 940 N.E.2d at 1205 (internal quotation marks and citation omitted). This is similar to the Eighth Amendment deliberate indifference standard set forth above for the failure to protect claims. As previously noted, no facts suggest the minimum-security unit at WCF posed a specific risk to Cordellione, other than the general risk of violence in prisons everywhere. Simply put, the complaint does not plausibly allege the Director's decision was made with wanton disregard of the consequences that befell Cordellione, especially considering that the officers and officials at WCF were the ones ultimately responsible for keeping Cordellione safe there. Accordingly, the gross negligence claim against the Director of Classification will be dismissed. *See Sharp*, 790 N.E.2d at 465; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (claim must be plausible on its face and complaint must provide adequate factual content).

      It is unclear whether Cordellione is also attempting to sue President Trump for gross negligence, but it *is* clear the complaint does not state such a claim. Cordellione sues President Trump in his individual capacity and again alleges he used "extremist rhetoric" and "transphobic hate speech" in the national media that "emboldened" the defendants and inmates and ultimately caused the attacks. (DE # 1 at 4.) The complaint

14

does not allege President Trump made any specific reference to Cordellione. Again, setting aside the various other legal impediments to suing the President of the United States for damages, the complaint does not plausibly allege a cognizable duty. "Absent a duty, there can be no negligence or liability based upon the breach, and whether a duty exists is a question of law for the court to decide." *Powell v. Stuber*, 89 N.E.3d 430, 433 (Ind. Ct. App. 2017). Here, the court cannot discern any sort of legal duty of care owed to inmates of a state prison who suffer criminal attacks by other inmates arising out of the general rhetoric of a national political figure. *See Cavanaugh's Sports B. & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 844 (Ind. 2020) (critical inquiry regarding duty is to determine whether the attack was foreseeable, considering the broad type of plaintiff, the broad type of harm, and whether the [defendant] had reason to expect any imminent harm"); *see also Stratmeyer v. U.S.*, 67 F.3d 1340, 1347 (7th Cir. 1995) (no duty owed to ranchers from USDA veterinarian because "the plaintiff must show that the duty of care running from the government defendant to the plaintiff is not an obligation to the public at large, but rather an obligation to the plaintiff as a particular individual."). The state law tort claim against President Trump will be dismissed.

*Injunctive Relief*

Cordellione requests both a permanent and preliminary injunction to "[t]ransfer to a female Institution" because "plaintiff is still suffering and likely to suffer continued harms." (DE # 1 at 6.) In the prison context, a court's ability to grant injunctive relief is significantly circumscribed. *See Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012). As to a

preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The complaint does not plausibly allege Cordellione is entitled to any injunctive relief. This screening order allows Eighth Amendment failure to protect claims to proceed against three individual officers at WCF related to the assaults and rapes that occurred there over the course of four days in January of 2025. The complaint does not describe any ongoing violation of federal law at WCF. *See Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) ("When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.").

Moreover, Cordellione has since been relocated to NCCF, so any injunctive relief claims associated with WCF are moot. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). If there are ongoing safety issues, those claims must be brought in a separate lawsuit in the district where Cordellione is currently incarcerated. As it stands, Cordellione has no chance of success on the merits of an injunctive relief claim in this case, so any preliminary injunctive relief related to this complaint will be denied.

For these reasons, the court:

(1) **GRANTS** Jonathan C. Richardson, a/k/a Autumn E. Cordellione, leave to proceed against Unit Team Manager Thompson, Officer Jane Doe, and Case Manager Gose in their individual capacities for compensatory and punitive damages for failing to protect Cordellione from the assaults and rapes by other inmates that occurred at the

16

Westville Correctional Facility between January 28–31, 2025, in violation of the Eighth Amendment;

(2) **DIRECTS** the Clerk to add the Warden of the Westville Correctional Facility in his official capacity as a defendant for the sole purpose of identifying Officer Jane Doe;

(3) **DISMISSES** all other claims;

(4) **DISMISSES** President Donald J. Trump and the Indiana Department of Correction Director of Classification;

(5) **DIRECTS** the Clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) the Warden of the Westville Correctional Facility, Unit Team Manager Thompson, and Case Manager Gose at the Indiana Department of Correction, with a copy of this order and the complaint (DE # 1);

(6) **ORDERS** the Indiana Department of Correction to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information;

(7) **WAIVES** the obligation of the Warden of the Westville Correctional Facility to file an answer to the complaint;

(8) **ORDERS** the Warden of the Westville Correctional Facility to appear and provide the name of the female officer who was working on the dorm and interacted with Jonathan C. Richardson, a/k/a Autumn E. Cordellione, regarding safety concerns

on January 29, 2025, <u>or</u> file a notice explaining why the name of this individual cannot be provided, by **January 31, 2026**; and

(9) **ORDERS**, under 42 U.S.C. § 1997e(g)(2), Unit Team Manager Thompson and Case Manager Gose to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

**SO ORDERED.**

Date: December 2, 2025

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT